Turley J.
delivered the opinion of the court.
This is a case of a contested nuncupative will, tried upon an issue of devisavit ml non, at the January term, 1848, of the circuit court of Carroll county, and brought by appeal in error to this court.
Upon the trial, it appeared that Littleberry W. Gwin, who was a citizen of Carroll county, volunteered to serve as a soldier in the Mexican war, in the year 1846, and attached himself to Capt. Murray’s company, 2nd regiment of Tennessee volunteers; that he was marched to Mexico, and died in camp near Camargoonthe 11th of October,1846; thathehad been sick under an attack of diarrhoea about five days, a disease at that time prevalent in the army at Camargo, and often fatal. In the morning of the 11th of October, 1846, Doct. David McKnight, the surgeon of the regiment, informed Capt. Murray and Lawrence B. Swift, a private in the company, that he (Littleberry W. Gwin) must soon die, and enquired if he had any family and property, and stated, that if he desired to make any disposition of it, it must then be done, and desired them to attend to it. Upon which said Murray and Swift went into the tent where Gwin was lying, and informed him of what the doctor had said, and of the probability of his death, and asked him if he wished to make any disposition of his property. Upon which he, in the presence of said Swift and Murray, directed Murray to tell his friends, “that in the disposal of his property, he wished his sister Elizabeth to have his boy Isaac; the rest of his property they could do with as they liked:” both these witnesses, at the time, “understood that he was making his will,” as they declare: this took place about one or two o’clock in the morning of the 16th of October, from which time he grew worse, and died about six o’clock of the same morning, retaining his mind and reason to the last.
*641 Capt. Murray deposes, that he understood the deceased to be making a disposition of his property in view of the probability of his death; the witness Swift having informed him that he would die. Murray also, in a letter written on the same day, to wit, the 11th of October 1846, a short time after the death of said Gwin, and which constituted a part of the proof in the case, and which is addressed to Dr.- E. Wright, the husband of Elizabeth, the sister of the deceased, and the person to whom he said he wished his negro boy Isaac to be given, says, in spealdng of the event: “he departed this life this morning about half past six o’clock, he was conscious of his fate; a short time before he died, I spoke to him of death; he informed me he did not fear death, as he felt prepared to die; he called his mess around him and warned them to prepare to meet him in heaven; he said he would have liked to have seen his relations, but as this could not be, he was resigned. I have never, in the course of my life, seen any person more composed, or who seemed more prepared to meet death. I was by his side the last four or five days of his illness. He told me to tell his friends to meet him in heaven, and not to mourn his fate; as he was only exchanging this world for a better. He directed me to tell his friends, that in the disposal of his property he wished his sister Elizabeth to have his boy Isaac; the rest of his property, they could do with as • they liked.” Said witness, also proves that beforé the time he ■ and Swift informed him under the directions of Dr. McKnight that he must die, they had cheered him with hopes of recovery, believing that despair would be injurious to him, as it had been to others; and that he did -not seem to think he was going to die, as he expressed a wish to take a trip down the Rio Grande in a steamboat, thinking it might be of service to him.
Harrison, a witness who says he was much with Gwin in his last illness, deposeth, that he was sent for about four *642 o’clock of the morning on which he died, and was informed by him, that he was about to die, and was requested by him to take a miniature likeness of him, and give it to a friend whom he named,”
Upon this state of facts, the circuit judge after reading the act of 1784, ch. 22, on the subject of wills, stated to the jury, that a literal compliance with the provisions of the 15th section of the act was not necessary to make a good nuncupa-tive will, that if the two witnesses considered themselves called upon by the language or conduct of the deceased to bear witness to his will, and did so, that that would be a sufficient attestation of his will, and a will so made would be good and valid.' He further stated to the jury, that the attesting witnesses must clearly and distinctly understand from the testator that he wished to make a will; and desired them to bear witness to it, and the jury must be well satisfied that such are the facts; otherwise, they must find against the will. He further stated to the jury, that any conversation of the deceased about his desire or wish relative to the disposal of his property, or any request in relation thereto, would not amount to a testamentary act, unless it were his intention to make a will.
Upon all which the jpry found a verdict in favor of the plaintiff, setting up the bequest of the negro Isaac to Elizabeth Gwin, sister of the deceased and wife of E. Wright, under the nuncupative will of the deceased, from which, the defendants, the legal heirs and distributees of the deceased, appealed to this court.
The first question presented for our consideration, is, whether the directions given by the deceased, as to the disposal of his property, to the witnesses Murray and Swift were testamentary in their character, and made in his last sickness in anticipation of death; and we cannot doubt that they were. The witnesses, had, under instructions from the attending physician, called upon the deceased for the purpose of inform *643 ing him that he must die, and of ascertaining from him what disposition he wished made of his property-. They did inform him of his fate; upon which he directed that his friends should be told that in the disposal of his property he wished his sister Elizabeth to have his boy Isaac, and that the rest of his property they could do with as they liked; this, under the circumstances could not have been a mere conversation about his wishes or desires in relation to his property, but must necessarily have been a bequest of the negro Isaac, by parol, to his sister Elizabeth; it was doné, upon being informed that he must die and upon being asked if he wished to make a disposition of his property; and moreover, both the witnesses understood him to be making his will; the will was made in his last sickness for he died in a few hours afterwards, and this is as much as the statute requires upon this branch of the subject; but if it were necessary that such a will should be made in immediate anticipation of death, we think the proof abundantly shows that this was so made. He was informed that he must die; his whole conduct and words from that time shows that he had abandoned all hope of living; he spoke of his death as certain; said he did not fear to die, requested his friends to prepare themselves to meet him in heaven; directed his miniature to be given to an absent friend; all this shows too clearly a fixed belief that his death was inevitable and pending, to admit of any doubt whatever. It will not do to say, that all these expressions and directions were given after the bequest to his sister, and that therefore, they do not establish the fact of such belief on his part at the time the bequest was made, because the time was so short between the two periods, that the inference is not fair that the belief of his death was impressed upon his mind after the bequest to his sister and not before.
Indeed we apprehend that such a supposition would never have been conceived by any one, but for a misconstruction of *644 a passage in the evidence of Oapt. Murray, which passage is this: “before this time (that is before the time he and Swift informed him that the doctor said he must die, and asked of him if he wished to make any disposition of his property,) they had cheered him with the hopes of recovery, because they thought despair would injure him as it had done others, and that he did not seem to think he was going to die, as he expressed a wish to take a trip down the Rio Grande in a steamboat, thinking it might be of service to him:” this case has been argued here as if the expression of his wish had been made at the time of the bequest or afterwards, when it was obviously made before he was informed of his impending fate and at the period when he was cheered by his friends with the hopes of recovery; and this is the period of time of which the witness is speaking when he says: he did not seem to think he was going to die.
The direction that the negro Isaac should be given to his sister is then a testamentary direction, made in his last illness and in anticipation of death.
2nd. Is this testamentary direction so proven under the act of 1784, chap. 22, as to be a good nuncupative will?
The 15th section of that act provides'that no nuncupative will in any wise shall be good when the estate exceeds two hundred and fifty dollars, unless proved by two witnesses, who are such as are admissible upon trials at common law, present at the making thereof, and unless they or some of them were specially required to bear witness thereto by the testator himself, and unless it was made in his last sickness in his own habitation or dwelling house or where he had been previously resident ten days at least, except he be surprised with sickness on a journey, or from home and dies without returning to his dwelling. The 16th provides that no nuncupative will shall be proved by the witnesses after six months from the mak *645 ing, unless it were put in writing within ten days after the death of the testator.
Now how many requisites are there created by the statute to constitute a good nuncupative will? 1st. There must be two good common law witnesses present at the making thereof. 2nd. They or some of them must be specially required to bear witness thereto by the testator himself. 3rd. It must have been made in.testator’s last sickness. 4th. It must have been in his own habitation and dwelling house, or where he had been previously resident ten days at least, except he be surprised with sickness on a journey, or from home, and dies without returning to his dwelling. 5th. It must be put in writing within ten days after the death of the testator, or it shall not be proven by the witnesses, after the lapse of six months from the deáth of the testator. Now let us test this nuncupation by these requisites: if any one of them is wanting it cannot be established as the will of the deceased, but in our opinion there is no one wanting. 1st. There were two good common law witnesses present at its making, viz: Swift and Murray. 2nd. Murray, one of the witnesses, was directed by the testator to inform his friends that in the disposal of his- property he wish-' ed his sister Elizabeth to have his boy Isaac. This we consider as equivalent to a special request on the part of the testator to the witness to bear witness thereto.
We have no desire or intention to refine upon the construction of this part of the statute or to go farther in extending the meaning of the words “specially required to bear witness thereto” than has been done in the case of Baker vs. Dodson, 4th Humph. 342. In that case two witnesses testified that the deceased, addressing himself to them said: “I wish to make a disposition of my effects” and then went on to declare the nuncupation. They felt and understood thereby, by such address to them and the language used to be called on special *646 ly to notice the factum of the will. The judge who delivered the opinion in the case said: “The leading object of the 15th section of the act of 1784 as to the special requirement to bear witness or the rogatio testium is doubtless to distinguish between a valid nuncupation and a casual conversation by one in his illness as to his wishes on the subject of his property to guard against the latter being imposed upon the court as testamentary. But it is not necessary for such purpose that the testator should know and quote the very language of the statute; it is sufficient if by intelligent act and language he invoke their special attention and attestation to what he is going to say and to what he has said. If he address them and say I wish to make a disposition of my effects and go on and then make the factum of said disposition, we cannot say that the statute has not been complied with.”
This construction of the statute we think is legitimate unless the power to make a nuncupative will is to be destroyed almost entirely by it. In that case then it was held that when a man said to two witnesses, I wish to make a disposition of my effects, and then proceeded to declare the nuncupation, the 'words were equivalent to a special request to bear witness thereto. Surely, no one will contend that when a person in his last illness, and a few hours before his death, is asked, if he wished to make any disposition of his property, and immediately in answer thereto, requests the witness to inform his friends that he wishes his property to be disposed of so and so, that it is not as direct an invocation to their special attention and attestation to his bequest, as if he had said to them,- I wish to make a disposition of my effects and had then proced-ed to declare the nuncupation.
3d. The-nuncupation was made in the testator’s last illness, viz: at Camarero.
*647 4th. I was made when he was surprised with sickness from his home to which he never returned.
5th. The nuncupation was put in writing by the witness, Murray, within ten days after the death of the testator, to wit: on the day he died, and was therefore legally proven by the witness though more than six months had elapsed from the death of the testator.
We therefore think there was no error committed by the circuit judge in the charge to the jury and the facts proven well warranted the verdict and the judgment. Judgment affirmed.